UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA

CASE NO. 1:24-cv-306-MR-WCM

TRACEY L. KOPPLIN and
JOHN C. KOPPLIN,

    Plaintiffs,

vs.

SUGAR MOUNTAIN RESORT, INC.,

    Defendant.
_____/

FILED
ASHEVILLE, NC

DEC 20 2024

U.S. DISTRICT COURT
W. DISTRICT OF N.C.

## COMPLAINT AND DEMAND FOR JURY TRIAL

*Pro se* Plaintiff Tracey L. Kopplin ("Mrs. Kopplin") hereby files this Complaint and Demand for Jury Trial against Defendant Sugar Mountain Resort, Inc. on behalf of herself and John C. Kopplin ("Mr. Kopplin") (collectively, "Plaintiffs"), and alleges as follows:

### PARTIES

1. Plaintiffs are married and are residents of and domiciled in Florida.

2. Defendant Sugar Mountain Resort, Inc. ("Sugar Mountain") is a North Carolina corporation with its principal place of business at 1009 Sugar Mountain Drive, Sugar Mountain, NC 28604 in Avery County, North Carolina.

### JURISDICTION & VENUE

3. This Court has original diversity jurisdiction under 28 U.S.C. § 1332 in that complete diversity of citizenship exists as between Plaintiffs, on the one hand, and Defendant, on the other hand, and the amount in controversy, exclusive of interest and costs and fees, exceeds $75,000.

4. Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391(b)(2) in that

a substantial part of the events or omissions giving rise to the claims asserted occurred in the Western District of North Carolina.

**GENERAL ALLEGATIONS**

5. Plaintiffs and their two daughters (collectively, the "Kopplin Family") visited Sugar Mountain for the first time on December 29, 2021. The Kopplin Family participated in a group ski lesson after purchasing lift tickets and renting the necessary ski equipment. They completed several successful runs on the "bunny hill" during their group lesson. At the end of their lesson, Brian, their instructor, informed them they were all ready to "graduate" from the bunny hill. Nevertheless, the Kopplin Family practiced on the bunny hill several more times.

6. The Kopplin Family thereafter took the lift to the top of, and skied down, Easy Street. The Kopplin Family enjoyed Easy Street without incident; and observed no hazards on Easy Street (and no signage at the top of Easy Street warning of hazards). The Kopplin Family left Sugar Mountain following their successful single run on Easy Street on December 29, 2021.

7. Two days later, on December 31, 2021, the Kopplin Family returned to Sugar Mountain, arriving at approximately 9:00 a.m. They again purchased lift tickets; rented the necessary ski equipment; and then headed over to Easy Street for what they thought would be their first of several enjoyable runs down Easy Street that day.

8. Unfortunately, unbeknownst to them, this would be the Kopplin Family's first and only run on December 31, 2021 due to the unmarked hazard on Easy Street that day.

9. Plaintiffs did not see any signage regarding the general surface conditions of Sugar Mountain between the time they arrived there and reached the base of Easy Street. In addition, there were no signs near the lift for Easy Street and no signs at, or near the top of, or at the entrance to, Easy Street warning of any hazardous conditions on Easy Street on December

2

31, 2021. Thus, Plaintiffs expected Easy Street to be in the same condition on December 31, 2021, as it was on December 29, 2021, when they skied down to the bottom without incident, and saw no hazardous conditions on Easy Street.

10. Easy Street was much more crowded on December 31, 2021 than it was on December 29, 2021, when Plaintiffs and their daughters successfully skied down Easy Street without incident. As discussed below, the effective crowd size was even larger due to an unmarked hazard two-thirds of the way down Easy Street because it forced skiers to divert to the left and right sides of the unmarked hazard; thereby, forcing them to be dangerously close to one another.

11. Because there were no signs posted prior to getting on the lift for Easy Street and no signs at the top of Easy Street warning skiers of the hazard, the Kopplin Family was not aware of the hazard as they were about to embark on their first (and only) run of the day on Easy Street. Although Plaintiffs were concerned about the much larger crowd on Easy Street, compared to their first time on Easy Street two days earlier, they and their daughters were excited to again enjoy skiing together. Unfortunately, their excitement was short-lived because, as discussed below, Mrs. Kopplin was in excruciating pain shortly thereafter due to the unsafe conditions of Easy Street (which caused Easy Street to be anything but "easy" for the novice skiers for which Easy Street was intended).

12. In any event, on December 31, 2021, the Kopplin Family got on and off the lift for Easy Street without incident. Before they began their descent, the Kopplin Family again discussed the safety plan they had employed on their successful run on Easy Street two days earlier: ski down slowly, and in intervals to keep their speed under control, and to remain

3

relatively close to one another in case anyone fell. They then started to ski down the slope in accordance with their plan.

13. Mrs. Kopplin skied safely and slowly down Easy Street two-thirds of the way to the bottom without incident. At that point, not far in front of her, she saw for the first time on Easy Street, near the center of the slope, large patches of brown/black areas with no snow. This hazardous condition was unmarked. Accordingly, Mrs. Kopplin had little time to react to the unmarked hazard, because in addition to being unmarked, skiers could not see it until it was almost too late to avoid it at all, let alone do so safely and under control. Thus, Mrs. Kopplin (and the many other novice skiers near her) were forced to suddenly change their direction to avoid the brown/black areas with no snow; or else risk potential serious injuries if they skied onto this hazardous condition.

14. In the few seconds she had before running aground on the brown/black areas with no snow, Mrs. Kopplin was first able to observe that these areas were actually beds of rocks. Thus, if she were not able to suddenly change direction, it was virtually certain she would have come to an abrupt stop on the unmarked hazard, which could have caused a painful fall and serious injuries. Fortunately, Mrs. Kopplin was barely able to divert to the left side (if viewed from the top of Easy Street) of the unmarked hazard. The left side of this unmarked hazard was wider than the right; so, the majority of other skiers near Mrs. Kopplin also went to the left side. This caused too many skiers to change direction suddenly, without warning to others, and in dangerous proximity to each other (which, of course, increases the likelihood of accidents and injuries).

15. Defendant should have warned skiers of the hazard on Easy Street with a sign prior to getting on the lift for Easy Street or at the top of Easy Street. Defendant also should

4

have marked the dangerous hazard; with orange traffic cones or orange plastic fencing, for example, so skiers could see it soon enough to safely avoid the unmarked hazard.

16. As a result of Defendant's failure to warn skiers of the hazard, and their failure to mark the hazard, Mrs. Kopplin partially lost control (as a result of being forced to suddenly change direction which caused her to be dangerously close to the other skiers), despite being in full control on the first two-thirds down Easy Street. Fortunately, Mrs. Kopplin was barely able to regain enough control to manage to avoid skiing into the unmarked hazard, and avoid crashing into her fellow skiers (and avoid being crashed into by them), all of whom were suddenly forced into dangerously close proximity due to their natural reaction to encountering the hazard of which they had no notice. Nevertheless, Mrs. Kopplin was understandably shaken, stunned, and trembling.

17. Almost immediately after Mrs. Kopplin barely avoided the unmarked hazard, and barely avoided a collision with her fellow skiers, Mrs. Kopplin's legs and skis were abruptly and forcefully knocked out from under her, causing her to land with all of her body weight on her right (dominant) wrist.

18. Mrs. Kopplin heard the gruesome sound of her wrist breaking upon impact of the fall; which obviously caused her to experience excruciating pain. While lying with the side of her face in the snow, screaming, crying, and trembling due to her excruciating pain, she did not know what had hit her. In addition, Mrs. Kopplin was terrified of suffering another painful injury from skiers crashing into her because they were passing by her so closely she could feel the snow spraying on her as she was lying on the slope stunned and writhing in excruciating pain from her broken wrist.

5

19. Mr. Kopplin, who had seen what happened to his wife, removed his skis and ran up the slope to her. Mrs. Kopplin asked her husband what had hit her, and he said: "It was [Mrs. Kopplin's daughter] ... So many people were zooming by her, and cutting her off, that she ran into you." In other words, Mrs. Kopplin's daughter lost control as a direct result of the unmarked hazard on Sugar Mountain.

20. In agonizing pain, Mrs. Kopplin laid on her right side with her face on the snow for a few minutes before a member of the Ski Patrol arrived, who immediately wanted to remove her right ski glove; but Mrs. Kopplin was in too much pain for him to do so. He then went up the slope to re-direct skiers around her and her husband (and their daughters), who were huddled around Mrs. Kopplin as she was suffering excruciating pain, because he was concerned that other skiers would crash into them.

21. When he came back down to the Kopplin Family, the Ski Patrol member said: "There's *too many* skiers out here ... we *need* to move."

22. He then helped Mrs. Kopplin to her feet and into a sled for him to then ski her down the slope; where she eventually made it to a Ski Patrol vehicle at the base of Sugar Mountain; and was driven to the Ski Patrol Office. Mrs. Kopplin was met there by three men who quickly determined that her right wrist was likely broken; and cut off her right glove. Not wanting to see her broken wrist, for fear of being horrified and passing out, Mrs. Kopplin looked away while they wrapped her wrist enough to immobilize it and keep it upright via a makeshift sling.

23. Mrs. Kopplin had never broken a bone before or experienced any pain close to the excruciating pain she was feeling. For her, it was worse than her recovery from having a Cesarean section for the birth of her daughter.

24.     In any event, while in the Ski Patrol Office, Mrs. Kopplin explained how the unmarked hazard caused her to almost lose control (as a result of being forced to suddenly change direction), and then into dangerously close proximity to too many of her fellow skiers, virtually all of whom were likely novices like her; and, therefore, also likely had to struggle to maintain their control.

25.     While two of the Ski Patrol members were tending to Mrs. Kopplin, the third member was questioning Mr. Kopplin in order to complete an accident/injury form since Mrs. Kopplin was not thinking clearly due to her excruciating pain; and did not see her daughter crash into her. Nevertheless, although Mrs. Kopplin partially signed (with her left hand due to her just-broken right wrist), the statement on the form containing her description of the incident in her "words" were *not* Mrs. Kopplin's own words. She would have noticed this if Mrs. Kopplin were able to thoroughly review the form; but she could not, due to her shock, excruciating pain and anxiousness in wanting to get to a hospital for treatment and pain management.

26.     In addition, if she were able to carefully review the form, Mrs. Kopplin would have noticed that the form *falsely* states that she suffered her excruciating injury during her *second* time on Easy Street on December 31, 2021. She would have also noticed that in the same section of the form, Defendant failed to fill in the blank where it was required to indicate who took Mrs. Kopplin's purported statement.[1]

27.     In any event, the Ski Patrol members told Mr. Kopplin to take his wife to the Watauga Medical Center in Boone, NC. Although it was obvious to the naked eye that Mrs. Kopplin's right wrist was broken, X-rays were taken and confirmed the fracture. Mrs. Kopplin

---

[1] Discovery will reveal if these "errors" were inadvertent; or, whether it is Defendant's custom and practice to gain an unfair and baseless advantage in anticipated litigation by: (a) never stating a skier was injured on their *first* time skiing on a given run, and/or (b) *concealing* the identity of its employee who took the skier's purported statement.

7

was given shots of lidocaine before two nurses tried to manually set her bones into a better (i.e. flatter) position before wrapping her wrist. But Mrs. Kopplin's pain was so excruciating the nurses were not able to do much; and they told her to follow up with an orthopedic surgeon when she returned home.

28. Mrs. Kopplin immediately contacted the Palm Beach Orthopaedic Institute and scheduled an appointment to see Andrew Seltzer, D.O., one of the hand/wrist specialists there, on January 4, 2022 (his first available appointment).

29. On January 3, 2022, the Kopplin Family made their 9-hour journey home. Mrs. Kopplin was still suffering from excruciating pain; which was exacerbated by every single bump in the road.

30. On January 4, 2022, Dr. Seltzer advised Mrs. Kopplin she needed surgery as soon as possible. On January 5, 2022, Dr. Seltzer performed surgery on her right wrist; during which a four-inch incision was made and a metal plate with 9 screws was affixed to the ends of the broken bone in order to repair her excruciating injury.

31. For the next several months, Mrs. Kopplin attended physical therapy twice each week. Wanting to regain full mobility of her dominant wrist, she was beyond diligent in keeping her appointments and exerting herself as much as she possibly could; which was initially limited due to post-surgical pain and tightness in her right wrist. Mrs. Kopplin also purchased and used the same materials used in physical therapy so she could also do the same exercises at home.

32. Although the bones in her wrist are considered to have healed, she still feels pain, and there are many personal activities Mrs. Kopplin can no longer do at all, or do the way she used to do before suffering her excruciating injury at Sugar Mountain. In addition, Mrs. Kopplin's career as a paralegal has been adversely affected due to the horrific injury she suffered

8

at Sugar Mountain. For example, her profession regularly requires Mrs. Kopplin to do extensive typing throughout the day, and often for extended periods of time (5-7 hours continuously), but she is unable to do so as a result of the lasting effects from breaking her dominant wrist on Easy Street. Moreover, Mrs. Kopplin can no longer provide the same amount and quality of service, comfort, society, companionship, affection, sexual relations, and solace to and/or with Mr. Kopplin, her husband.

## COUNT I
### (Negligence)

33. Plaintiffs repeat and reallege each and every allegation set forth in the paragraphs 1-32 above as though fully set forth herein.

34. On its website, Defendant posts the portion of the North Carolina Skier Safety Act which addresses the safety responsibilities of skiers; but *not* posted on its website are safety responsibilities of a "ski area operator" like Defendant.[2]

35. Pursuant to the North Carolina Skier Safety Act, Defendant was legally obligated to: (a) post, in a conspicuous manner, the general surface conditions for Sugar Mountain; (b) post at or near the top of or entrance to Easy Street reasonable notice of unusual conditions; (c) mark clearly any hidden rock, hidden stump, or any other hidden hazard known by Defendant to exist on Easy Street; and (d) not to engage willfully or negligently in any type of conduct that contributes to or causes injury to another person. *See* N.C. Gen. Stat. § 99C-2(c)(4)(6)(6b)(7).[3]

---

[2] https://skisugar.com/safety/. Although it fully quotes the skiers' legal safety responsibilities, Defendant's short synopsis (directly below its verbatim reproduction) -- of the subsection therein upon which Defendant is likely to rely in its defense in this action -- is misleading.

[3] Defendant was also required to inspect Easy Street at least twice daily and maintain a log recording: (i) the time of the inspection and the name of the inspector(s); and (ii) the general surface conditions, based on industry standards, for the entire ski area at the time of the inspections. *See* N.C. Gen. Stat. § 99C-2(c)(6a). It is unknown to this time whether Defendant fulfilled their additional statutory responsibility;

9

36. Defendant failed to fulfill its above-referenced statutory responsibilities.

37. A ski operator's violation of its above-referenced statutory responsibilities is deemed negligence as a matter of law, if same proximately caused injury and damages. *See* N.C. Gen. Stat. § 99C-3.

38. Defendant was negligent, as a matter of law, because Mrs. Kopplin suffered a major injury and damages as a direct and proximate result of Defendant's violation of its statutory responsibilities.

**WHEREFORE**, judgment should be entered in favor of Plaintiff Tracey L. Kopplin, and against Defendant Sugar Mountain Resort, Inc., providing for: (a) compensatory damages in an amount to be determined at trial but in no event less than $500,000; (b) costs and attorneys' fees; (c) post judgment interest; and (d) any other relief that is just and proper.

## COUNT II
### (Loss of Consortium)

39. Plaintiffs repeat and reallege each and every allegation set forth in the paragraphs 1-32 above as though fully set forth herein.

40. At all material times, Plaintiffs were married to each other and living together as husband and wife.

41. As a direct and proximate result of the aforementioned negligence of Defendant, Mr. Kopplin has been in the past and will be in the future deprived of the same level of service, comfort, society, companionship, affection, sexual relationship, and solace of Mrs. Kopplin, his wife, due to her injuries suffered as a result of Defendant's negligence.

---

but, if discovery reveals that Defendant did not fulfill same, Plaintiffs will seek leave to amend this Complaint.

**WHEREFORE**, judgment should be entered in favor of Plaintiff John C. Kopplin, and against Defendant Sugar Mountain Resort, Inc., providing for: (a) compensatory damages in an amount to be determined at trial but in no event less than $200,000; (b) costs and attorneys' fees; (c) post judgment interest; and (d) any other relief that is just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs, pursuant to Rule 38 of the Federal Rules of Civil Procedure, request a trial by jury of any issues so triable by right.

Respectfully submitted,

*/s/ Tracey L. Kopplin*
*Pro Se Plaintiff*
2806 SW Newberry Court
Palm City, Florida 34990
Telephone: (561) 601-2616
Email: traceylanders@gmail.com

11

Case 1:24-cv-00306-MR-WCM    Document 1    Filed 12/20/24    Page 11 of 11